Coronel v Chandra (2024 NY Slip Op 50166(U))

[*1]

Coronel v Chandra

2024 NY Slip Op 50166(U)

Decided on February 22, 2024

Supreme Court, Kings County

Mallafre Melendez, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on February 22, 2024
Supreme Court, Kings County

Rafael A. Coronel, as Administrator of the Estate of FEMALE CORONEL a/k/a KAYLA MILAGROS CORONEL MAURA, RAFAEL CORONEL, individually and ROSA CORONEL, individually, Plaintiffs,

against
Prasanta Chandra, M.D., ST. NICHOLAS OB GYN ASSOCIATES, P.C., 
 SHIRLEY WEBBE, D.O., STEVEN SWANCOAT, M.D., DR. MUKHERJEE
a/k/a DR. MUKERGEE a/k/a DR. MUKERJEE, BALI K. RAVA, M.D., INTERCOUNTY OBSTETRICS & GYNECOLOGY ASSOCIATES, P.C. and WYCKOFF HEIGHTS MEDICAL CENTER, Defendants.

Index No. 516254/2017

Plaintiffs
Ingrid Heide, Esq. (iheide@tgllaw.com)
Trolman, Glaser, Corley & Lichtman, P.C.
747 3rd Ave., Fl 23
New York, NY 10017
212-750-1200
Defendants Prasanta Chandra, M.D., St. Nicholas Ob Gyn Associates, P.C., and Bali K. Rava, M.D.
Mark Khavkin, Esq. (mkhavkin@sacslaw.com)
Shaub, Ahmuty, Citrin & Spratt, LLP
1983 Marcus Avenue
Lake Success, NY 11042
516-326-7153
Defendant Shirley Webbe, D.O.
Jennifer Lynn Larkin-Higgins, Esq. (jlarkinhiggins@gabrielemarano.com)
Gabriele & Marano, LLP
100 Quentin Roosevelt Blvd, PO Box 8022
Garden City, NY 11530
516-542-1000
Defendant Steven Swancoat, M.D.
[No representation recorded]
Defendant Dr. Mukherjee a/k/a Dr. Mukergee a/k/a Dr. Mukerjee Charles E. Kutner, Esq. (ckutner@ckutner.com)
Kutner Friedrich, LLP
950 Third Avenue, 11th Floor
New York, NY 10022
212-308-0210
Defendant Intercounty Obstetrics & Gynecology Associates, P.C.
[No representation recorded]
Defendant Wyckoff Heights Medical Center
Lynn Carroll Hajek, Esq. (lynn@lawahl.com)
Arshack, Hajek & Lehrman, PLLC
1790 Broadway, Fl 7
New York, NY 10019
212-582-6500

Consuelo Mallafre Melendez, J.

Recitation, as required by CPLR §2219 [a], of the papers considered in the review:
NYSCEF #s: 133 — 212
Defendants Prasanta Chandra, M.D. ("Dr. Chandra"), St. Nicholas Ob-Gyn Associates, P.C. ("St. Nicholas Ob-Gyn"), and Bala K. Ravi, M.D. s/h/a Bali K. Rava, M.D. ("Dr. Ravi") move (Seq. No. 7) for an Order, pursuant to CPLR 3212, awarding summary judgment to Dr. Chandra, St. Nicholas Ob-Gyn, and Dr. Ravi, and dismissing Plaintiffs' complaint in its entirety against them, or in the alternative, granting partial summary judgment and dismissing any claims and/or theories of liability as to which there are no material issues of fact.
Defendant Shirley Webbe, D.O. ("Dr. Webbe") separately moves (Seq. No. 8) for an Order, pursuant to CPLR 3212, granting summary judgment and dismissal of all claims against Dr. Webbe.
Defendant Wyckoff Heights Medical Center ("Wyckoff Heights" or "the hospital") separately moves (Seq. No. 9) for an Order, pursuant to CPLR 3212, granting summary judgment to Wyckoff Heights and dismissal of all claims against them.
An Order granting all three motions on default and dismissing the action against all moving defendants was signed on January 16, 2024. That Order is hereby vacated and replaced with the decision herein.
Plaintiffs oppose the motion of Dr. Chandra, St. Nicholas Ob-Gyn, and Dr. Ravi (Seq. No. 7), and the motion of Wyckoff Heights (Seq. No. 9). Co-Defendants Dr. Chandra, St. Nicholas Ob-Gyn, and Dr. Ravi submitted additional opposition to Wyckoff Heights's motion.
There is no opposition to Dr. Webbe's motion (Seq. No. 8). The motion on behalf of Dr. Webbe is granted without opposition, and all claims against Dr. Webbe are hereby dismissed.
Plaintiffs commenced this action on August 21, 2017, asserting claims of negligence and medical malpractice in connection to obstetric and gynecological care rendered from August 29, 2015, through August 31, 2015, which allegedly resulted in injuries, pain and suffering, and death of Female Coronel a/k/a Kayla Milagros Coronel Maura (the "infant" or "fetus" at relevant times). Plaintiffs Rosa Coronel ("Ms. Coronel" or "patient") and Rafael Coronel also assert individual claims for loss of consortium.
Prior to August 29, 2015, Ms. Coronel was receiving prenatal care during her pregnancy from Dr. Chandra, founder and president of St. Nicholas Ob-Gyn. Dr. Chandra had admitting privileges at Wyckoff Heights. The parties do not dispute that Ms. Coronel "had an essentially uneventful prenatal course" for a 38-year-old expectant mother with well-controlled gestational diabetes (Plaintiff Expert A aff, ¶ 4-6). On August 29, 2015, at or around 6:24 p.m., Ms. Coronel presented to Wyckoff Heights with complaints of decreased fetal movement. She was evaluated as stable and admitted for induction of labor. Dr. Chandra was named as her "Attending MD" on hospital records. A history and physical assessment written by Dr. Erica Gomez, a first-year resident, was co-signed electronically by Dr. Chandra on September 15, 2015.
Hospital records indicate that Ayesha Hussain, D.O. ("Dr. Hussain") a fourth-year resident, evaluated Ms. Coronel on August 30 at 7:01 a.m., and Ms. Coronel reported adequate fetal movement and no vaginal bleeding. Dr. Hussain recorded that the patient had consented to induction of labor, and that she would be transferred to a bed for labor induction via Cytotec. Dr. Hussain noted "Will discuss management with Attending Physicians Dr. Chandra and Dr. Webbe [FN1]
." Dr. Chandra later co-signed this note electronically on September 15, 2015 (NYSCEF Doc No. 148, at 90-93).
Ms. Coronel's labor progressed appropriately through 12:15 p.m., when the first Cytotec insertion was placed. A progress note including the line "Discussed with attending physician Dr. Chandra" was signed by Dr. Morgan Barlow, a.k.a. Dr. Morgan West ("Dr. Barlow"), a first-year resident, at 12:40 p.m. Dr. Chandra co-signed the note electronically on September 15, 2015 (id., at 94-97).
Rafael Coronel testified that at some time after the first Cytotec insertion, approximately between 2:00 p.m. and 3:00 p.m. on August 30, Ms. Coronel reported "she was wet and she had a little bit of blood." He testified that the doctors attending to her advised them this was "normal," and the bleeding later stopped (Rafael Coronel tr at 59-62).
The second Cytotec insertion was given at 4:20 p.m. A progress note from Dr. Barlow at that time includes the notes "Doing well, no complaints" and "No vaginal bleeding." The note also reads "Discussed with attending physician Dr. Chandra." This note was co-signed by Dr. Ravi, another attending physician at the hospital, at 9:18 a.m. the following morning (NYSCEF Doc No. 148, at 98-101).
On August 30 at 7:08 p.m., Ms. Coronel was planned to start Pitocin for labor augmentation. The progress note from that time again reads "Discussed with attending physician Dr. Chandra." It was signed by Dr. Barlow and co-signed by Dr. Ravi on August 31, 2015 (id., at 102-105).
Contrary to these hospital records, Dr. Chandra testified that he was not the "Attending [*2]MD" at any time from Ms. Coronel's admission to the eventual c-section delivery of her infant. He further testified that Defendant Dr. Mukherjee a/k/a Dr. Mukergee a/k/a Dr. Mukerjee ("Dr. Mukherjee") was covering for him at the hospital from August 29, 2015, and thereafter. Ms. Coronel and Rafael Coronel also testified that Dr. Chandra, who treated Ms. Coronel previously, was not physically present at the hospital from August 29 to August 31.
Nurse Viktoriya Royzen testified that based upon her notes, Dr. Mukherjee was Ms. Coronel's attending physician during her shift on August 30 at 2:00 p.m. Nurse Tanya Williams testified that based on her notes, Dr. Mukherjee was the attending physician during her shift beginning at 7:00 p.m. Dr. Mukherjee's first appearance in hospital records is a note from Nurse Williams that he consented for Ms. Coronel to ambulate at 7:32 p.m. (NYSCEF Doc No. 148, at 234).
Around 9:00 p.m., Ms. Coronel testified that she saw blood running down her legs when she used the bathroom, but she was told by doctors and medical personnel it was normal (Ms. Coronel tr at 78-79). She testified that she was returned to an IV "to have the baby move" (id. at 80). According to hospital records and the testimony of Nurse Williams, Pitocin/Oxytocin augmentation was started around 9:30 p.m. In an addendum, Nurse Williams noted that risks and benefits of Pitocin augmentation were explained to the patient through a Spanish interpreter from LanguageLine, a telephone interpreter service used by Wyckoff Heights, and Ms. Coronel consented to the labor augmentation. At 10:00 p.m., Category II tracings were reported from the fetal heart monitor, showing a non-reassuring fetal heart rate. Nurse Williams noted that an exam was performed at 10:22 p.m. by a resident named Dr. Galuk.
From August 31, 2015, at or around 12:14 a.m. onward, it is undisputed that Dr. Mukherjee was the attending physician who was directing Ms. Coronel's treatment (NYSCEF Doc No. 148, at 235). At this time, gradual deceleration of the fetal heart rate was noticed and reported to Dr. Mukherjee, and Pitocin/Oxytocin was turned off. With the assistance of Steven Swancoat ("Dr. Swancoat"), a fourth-year resident, Dr. Mukherjee ruptured Ms. Coronel's membranes, observed bloody fluid, and called for an emergency c-section at 12:30 a.m. due to a suspected placental abruption. Because the doctors spoke "very little" Spanish and could not explain what was happening to Ms. Coronel, they attempted to reach LanguageLine but were "unsuccessful" and "no one answered" (Dr. Swancoat tr at 35). Dr. Swancoat and Dr. Mukherjee then attempted to "find a Spanish speaking nurse or clerk" to translate (Dr. Swancoat aff, ¶ 7). A hospital clerk named Michelle Arbolida acted as an impromptu interpreter. Dr. Swancoat testified that they waited for her to return from getting dinner but did not recall how long they waited (Dr. Swancoat tr at 37).
After obtaining Ms. Coronel's consent, Dr. Mukherjee began a c-section at 1:00 a.m. with skin incision at 1:14 a.m. (NYSCEF Doc No. 148, at 236). The infant was delivered alive at 1:22 a.m. with hypoxic encephalopathy, sepsis, and perinatal asphyxia. She was unresponsive, bleeding from the nose and mouth, and was also severely anemic due to blood loss from a placental abruption. The infant was treated by a neonatologist, intubated, and ultimately transferred to North Shore University Hospital, where she passed away five days later on September 4, 2015.
Generally, "[i]n determining a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party" (Stukas v Streiter, 83 AD3d 18, 22 [2d Dept 2011]). "Any conflicts in the testimony merely raise an issue of fact for the fact-finder to resolve" (Palmiero v Luchs, 202 AD3d 989, 992 [2d Dept 2022], citing Lavi v NYU Hosps. [*3]Ctr., 133 AD3d 830, 832 [2d Dept 2015]). In evaluating a summary judgment motion in a medical malpractice case, the Court applies the burden shifting process as summarized by the Second Department:
"The elements of a medical malpractice cause of action are a deviation or departure from accepted community standards of practice, and that such departure was a proximate cause of the plaintiff's injuries. When moving for summary judgment, a defendant provider has the burden of establishing the absence of any departure from good and accepted medical practice or that the plaintiff was not injured thereby. In order to sustain this burden, the defendant must address and rebut any specific allegations of malpractice set forth in the plaintiff's bill of particulars. In opposition, the plaintiff must demonstrate the existence of a triable issue of fact as to the elements on which the defendant has met his or her initial burden. General allegations of medical malpractice, merely conclusory and unsupported by competent evidence tending to establish the essential elements of medical malpractice, are insufficient to defeat a defendant's summary judgment motion. Although summary judgment is not appropriate in a medical malpractice action where the parties adduce conflicting medical expert opinions, expert opinions that are conclusory, speculative, or unsupported by the record are insufficient to raise triable issues of fact" (Barnaman v Bishop Hucles Episcopal Nursing Home, 213 AD3d 896, 898-899 [2d Dept 2023] [internal quotation marks and citations omitted].
In support of the branch of the motion (Seq. No. 7) seeking summary judgment on behalf of Dr. Chandra and St. Nicholas Ob-Gyn, the defendants submit an expert affirmation from Gary Mucciolo, M.D. ("Dr. Mucciolo"), a certified Ob-Gyn, as well as extensive hospital records and the deposition transcripts of Rafael Coronel, Ms. Coronel, Dr. Chandra, Dr. Webbe, Dr. Ravi, Dr. Swancoat, Nurse Williams, Nurse Royzen, Dr. Erica Gomez, Dr. Hussain, and Dr. Barlow.
Of note, the moving defendants do not dispute that St. Nicholas Ob-Gyn would be vicariously liable for the alleged negligence of Dr. Chandra. They argue only that Dr. Chandra did not deviate from accepted medical standards during the limited time he was allegedly directing Ms. Coronel's care and treatment.
Ms. Coronel and Rafael Coronel both testified that Dr. Chandra was never present at the hospital during Ms. Coronel's labor or c-section. Dr. Chandra testified that he was away during this time and Dr. Mukherjee was covering for him. However, Dr. Chandra's name appears throughout the medical records as the "attending physician" of Ms. Coronel who directed and discussed her course of treatment with residents. He placed his electronic signature on residents' notes from August 29 at 9:21 p.m. to 12:40 p.m. the following day. A resident noted that the second Cytoetc insertion to induce labor on August 30 after 4:00 p.m. was "discussed with attending physician Dr. Chandra." At 7:08 p.m., another progress note says the plan to start Pitocin was "discussed with attending physician Dr. Chandra."
According to Dr. Chandra, "[w]hoever covers my patient, they're in charge of the patient at that time" and he is "not necessarily" consulted about the patient's status (Dr. Chandra tr at 95). However, he testified that the hospital staff had his contact information, and he did not recall or remember whether he discussed Ms. Coronel's care with Dr. Hussain, Dr. Barlow, or any others indicated on the hospital records. He testified that he co-signed the progress notes because he is required to wherever his name appears (Dr. Chandra tr at 102).
Dr. Chandra and St. Nicholas Ob-Gyn argue that Dr. Mukherjee alone was the private [*4]attending physician for Ms. Coronel at Wyckoff Heights from August 29 through August 31, and therefore Dr. Mukherjee is liable for any malpractice which may have occurred.
Notwithstanding this argument, the latest time Dr. Chandra's name appears in the record is Dr. Barlow's 7:08 p.m. note. The defendants' expert Dr. Mucciolo opines, based on his review of the records, that even if Dr. Chandra were directing decisions as late as 7:08 p.m., none of Ms. Coronel's treatment up to that point deviated from accepted medical standards. Dr. Mucciolo opines that Ms. Coronel had a seemingly unremarkable pregnancy, and there were "absolutely no signs of placental abruption or impending placental abruption" when her labor was first induced with Cytotec and augmented with Pitocin. Dr. Mucciolo opines that Ms. Coronel's labor through 7:08 p.m. was monitored and managed appropriately and within accepted medical standards. As of that time, "there was no bleeding, there was no maternal fetal hemorrhage, there was no leakage of fluid [and] fetal heart monitoring evidenced Category I tracings." He concludes that Ms. Coronel's treatment with Cytotec and the plan to begin augmentation with Pitocin was appropriate, that there was no need at that time for a c-section, and that the placental abruption and death of the infant were not proximately caused by any negligence from Dr. Chandra.
The defendants argue that there is no evidence any decisions after 7:08 p.m. on August 30 were overseen by or discussed with Dr. Chandra, and therefore, Dr. Mucciolo does not offer any expert opinion on the Ms. Coronel's care and treatment after that time.
In opposition, Plaintiffs raise issues of fact and a conflicting expert affirmation from certified Ob-Gyn (name of expert redacted). The Court was presented with the signed, unredacted affirmation for in camera inspection. Rafael Coronel testified that his wife first reported vaginal bleeding between 2:00 p.m. and 3:00 p.m., prior to the second Cytotec insertion and the Pitocin labor augmentation. Plaintiffs' gynecological expert opines that even before 7:08 p.m., the treatment received by Ms. Coronel was "substandard and departed from accepted practice," because Dr. Chandra failed to properly evaluate the patient in response to her complaints of vaginal bleeding and improperly proceeded with labor augmentation. The expert opines that if a proper physical examination, ultrasound, and rupture of membranes had been performed after Ms. Coronel's complaints of vaginal bleeding, "evidence of a placental abruption would have been detected and a STAT cesarean delivery would have been recommended." The expert further opines that Pitocin should not have been given without such an evaluation to avoid "further stress on a fetus which may be compromised." The expert opines that the use of Pitocin reduced oxygenation to the fetus and reduced labor tolerance, worsening the fetus's outcome, as evidenced by the Category II tracings that appeared soon after.
Plaintiffs also contend that there is an issue of fact as to who was responsible for Ms. Coronel's treatment in the hours before the c-section was called by Dr. Mukherjee at 12:30 a.m. Dr. Mukherjee himself is represented as a defendant but never appeared for deposition. Although the moving defendants argue that he was the private attending physician from the start, his earliest mention by other non-parties is at 2:00 p.m. based the notes on Nurse Royzen, or at 7:32 p.m. when he allowed Ms. Coronel to ambulate, according to Nurse Williams's notes. Meanwhile, other hospital records repeatedly referred to Dr. Chandra as the physician consulted in connection with Ms. Coronel's labor induction and augmentation.
Plaintiffs' gynecological expert opines that after 9:00 p.m., when Ms. Coronel testified that she reported more vaginal bleeding, whichever physician was in charge should have timely evaluated her condition and should not have proceeded to administer the Pitocin. When the [*5]fetus's Category II tracings were first recorded at 10:00 p.m., whichever physician was in charge should have timely performed an examination, placed a fetal scalp electrode, ruptured Ms. Coronel's amniotic membranes, discontinued Pitocin, and instituted resuscitative measures such as changing the mother's position and giving IV fluids. Instead, it appears there was a single examination performed at 10:30 p.m. and Pitocin was not discontinued for another two hours, when the placental abruption was discovered by vaginal examination at 12:14 a.m. Plaintiffs' expert opines that proper monitoring and treatment would have "immediately alerted the medical personnel to the presence of a possible placental abruption and the need for an immediate cesarean delivery," and either Dr. Chandra or Dr. Mukherjee's negligence in those hours resulted in the infant's compromised birth and death.
Plaintiffs have sufficiently raised issues of fact which preclude summary judgment in favor of Dr. Chandra and St. Nicholas Ob-Gyn. Dr. Chandra testified that he had no involvement in Ms. Coronel's care during the relevant hours on August 30, but his presence and signature on multiple hospital records creates an issue of fact as to whether he was the lead physician with whom her course of treatment was "discussed," whether by phone or in person. The notes in question were signed electronically, hours or days later, but Dr. Chandra still placed his signature on the documents and did not amend their contents. In her own deposition, resident Dr. Barlow — who wrote the progress notes signed by Dr. Chandra and Dr. Ravi — testified that she would not have spoken to an attending physician herself, but a more senior resident would. She did not recall who the senior resident at the time was, and testified about Dr. Chandra, "I can't remember if I talked with him or not, or if I had spoken to my senior and they told me they were going to talk with Dr. Chandra" (Dr. Barlow tr at 29).
If Dr. Chandra did direct Ms. Coronel's treatment before 7:08 p.m., the parties' experts offer conflicting opinions as to the soundness of that treatment, especially in light of Rafael Coronel's testimony that there were signs of vaginal bleeding as early as 2:00-3:00 p.m. While the defendants suggest whether any bleeding was known or reported at this time is an issue of credibility, due to the notation of "no vaginal bleeding" in hospital notes, such issues must necessarily be resolved by a jury. Plaintiffs' expert has raised issues of fact as to whether Ms. Coronel's labor was adequately monitored, whether her reports of bleeding were properly evaluated, and whether the use of Pitocin under these circumstances contributed to her infant's reduced oxygen supply.
Furthermore, issues of fact remain as to whether Dr. Chandra and St. Nicholas Ob-Gyn are liable for the alleged malpractice in Ms. Coronel's treatment which occurred from 9:00 p.m. to 12:00 a.m., e.g., failing to timely evaluate and respond to the Category II tracings and vaginal bleeding. Dr. Chandra denies having anything to do with the patient after his last mention in Dr. Barlow's progress note at 7:08 p.m., and he testified that Dr. Mukherjee was officially covering for him the entire time she was admitted to the hospital. However, the record is unclear as to exactly which physician was directing Ms. Coronel's treatment in the hours before her c-section was finally performed by Dr. Mukherjee. According to the hospital notes and direct recollection of Dr. Swancoat, Dr. Mukherjee was the attending physician in charge at approximately 12:00 a.m. the morning of August 31. Drawing every inference in favor of the non-moving Plaintiffs, Dr. Chandra's appearance as the "attending physician" multiple times in the record creates an issue of fact as to whether he or Dr. Mukherjee was liable for Ms. Coronel and her fetus's care at any time between 9:00 p.m. and 12:00 a.m.
Notwithstanding the above, to the extent that Plaintiffs allege lack of informed consent [*6]for Ms. Coronel's labor induction or augmentation, Dr. Mucciolo opines based on the hospital records and testimony that the patient was informed of risks and benefits, and written consent was properly obtained by residents and nurses with the aid of a LanguageLine interpreter.
Plaintiffs failed to raise any issues of fact or offer an expert opinion to counter the defendants' prima facie argument that informed consent for the labor induction and augmentation was properly obtained. On this claim or theory of liability only, Dr. Chandra and St. Nicholas Ob-Gyn's motion is granted.
The branches of the motion seeking summary judgment on behalf of defendants Dr. Chandra and St. Nicholas Ob-Gyn are granted to the extent of dismissing any claims for lack of informed consent, and the motion is otherwise denied.
In another branch of the same motion (Seq. No. 7), the moving defendants seek summary judgment on behalf of Dr. Ravi. At the time of Ms. Coronel's admission in 2015, Dr. Ravi was an attending physician and Director of Gynecology at Wyckoff Heights. She testified that her role was to "take care of the non-private GYN patients that come to Wyckoff Heights Hospital" (Dr. Ravi tr at 19). In relation to Ms. Coronel's treatment, Dr. Ravi co-signed two progress notes written by first-year resident Dr. Barlow at 4:24 p.m. and 7:08 p.m. on August 30. Both progress notes indicate "no bleeding," the first note records the second Cytotec placement, and the second note includes the plan to start labor augmentation with Pitocin. Dr. Ravi signed the notes at 9:18 a.m. and 9:19 a.m. the following morning, respectively.
Dr. Ravi testified that she signed these notes in error and was never part of Ms. Coronel's labor and delivery team. Dr. Ravi testified that to the best of her knowledge, the only reason her signature would appear on the records was that "the resident erroneously put it in my inbox for signatures, and I mistakenly signed it in the process of closing the chart before I go home" (Dr. Ravi tr at 26). She further testified that generally residents must have the attending physician co-sign their notes, but she never provided coverage for Dr. Chandra's patients or any other "private patients of another physician," and the note should have been assigned to Dr. Chandra or the physician covering for him.
In her own deposition, Dr. Barlow could not recall which senior resident and doctor had discussed Ms. Coronel's course of treatment. She testified that Dr. Ravi was "another attending physician that would cover the floor on occasion," but she did not know why the note was assigned to Dr. Ravi for a signature (Dr. Barlow tr at 41).
The defendants also argue that even if Dr. Ravi's signature correctly appeared on these notes, none of Ms. Coronel's treatment prior to 7:08 p.m. on August 30 deviated from accepted medical standards or proximately caused the injuries or death of the infant, relying on the same expert affirmation of Dr. Mucciolo. Dr. Mucciolo opines that Ms. Coronel exhibited no signs of abnormalities through 7:08 p.m., that the use of Cytotec and Pitocin were well within good and accepted standards of care, and her providers obtained informed, written consent for the labor induction and augmentation.
In opposition to Dr. Ravi's branch of the motion, Plaintiffs' expert opines again that Ms. Coronel was improperly monitored, and her labor was induced after she showed signs of vaginal bleeding based on Rafael Coronel's testimony, which the defendants' expert Dr. Mucciolo does not address. Plaintiffs' expert opines that this negligence resulted in the poor oxygenation and eventual death of the infant, because Ms. Coronel's bleeding was not timely evaluated for signs of possible placental abruption, and the use of Pitocin in this context caused the infant's "impaired oxygenation which continued or worsened until the infant's delivery." The fact Dr. [*7]Ravi is the only attending physician who seemingly "co-signed" the first-year resident's notes on this course of treatment creates an issue of fact as to her role and potential liability in Ms. Coronel's treatment.
Plaintiffs have sufficiently raised issues of fact as to whether there was malpractice on the part of Dr. Ravi. Viewing the evidence and all inferences in the light most favorable to the non-moving Plaintiffs, there are issues of fact as to whether the attending physician who directed Ms. Coronel's second Cytotec placement and Pitocin plan was Dr. Chandra who was named in the records, Dr. Ravi who signed off on them, or Dr. Mukherjee who ultimately performed Ms. Coronel's c-section hours later. "The function of the court on a motion for summary judgment is not to resolve issues of fact or determine matters of credibility, but merely to determine whether such issues exist" (Khutoryanskya v Laser & Microsurgery, P.C., 222 AD3d 633, 635 [2d Dept 2023], quoting Kolivas v Kirchoff, 14 AD3d 493 [2d Dept 2005]).
On the issue of informed consent, Dr. Mucciolo again sets forth that prior to Dr. Ravi's last appearance in the record at 7:08 p.m., Ms. Coronel's informed consent for the labor induction and augmentation was properly obtained by the residents and nurses through a translator. Plaintiffs have not raised any issues of fact on this issue in opposition.
For these reasons, the branch of the motion seeking to dismiss the complaint as to Dr. Ravi is granted to the extent of dismissing any claims for lack of informed consent, and the motion is otherwise denied.
Turning to the claims against Wyckoff Heights, as a general rule, a hospital bears no vicarious liability for the alleged negligence or malpractice of a patient's private attending physician. "[A] hospital may not be held vicariously liable for malpractice of a private attending physician who is not an employee and may not be held concurrently liable unless its employees committed independent acts of negligence" (Toth v Bloshinsky, 39 AD3d 848, 850 [2d Dept 2007]). "Where hospital staff, such as resident physicians and nurses, have participated in the treatment of the patient, the hospital may not be held vicariously liable for resulting injuries where the hospital employees merely carried out the private attending physician's orders" (Pezulich v Grecco, 206 AD3d 827, 829 [2d Dept 2022]; see also Seiden v Sonstein, 127 AD3d 1158, 1160 [2d Dept 2015]). A hospital will only be liable in such situations where its employees have committed independent acts of negligence, or where "the doctor's orders are so clearly contraindicated by normal practice that ordinary prudence requires inquiry into the correctness of the orders" (Pezulich, quoting Toth; see also Doria v Benisch, 130 AD3d 777 [2d Dept 2015]).
Wyckoff Heights submits, inter alia, an affidavit from Wyckoff Heights's Chairman of Obstetrics and Gynecology, Ralph Ruggiero, M.D. ("Dr. Ruggiero"). Dr. Ruggiero avers, based on a review of all evidence in the record, Ms. Coronel was a private patient of Dr. Chandra and his covering physician Dr. Mukherjee, and Dr. Chandra and Dr. Mukherjee were "responsible for all aspects of the patient's labor and delivery care," including "evaluating the patient while she was in labor, reviewing all fetal monitoring strips, supervising the nursing and resident treatment of the patient, and making all treatment decisions." Dr. Ruggiero inferred from the hospital records that at relevant times, Dr. Mukherjee "was present and consulted by the nurses," and that Dr. Chandra also "could have been consulted over the telephone." Therefore, Wyckoff Heights make a prima facie case that Dr. Chandra and Dr. Mukherjee were Ms. Coronel's private attending physicians and there was no independent negligence on the part of hospital staff in Ms. Coronel's labor and delivery care.
In opposition, Plaintiffs allege that the Wyckoff Heights staff exercised independent negligence by failing to document or report Ms. Coronel's complaints of vaginal bleeding. Rafael Coronel testified that she first showed signs of bleeding between 2:00 p.m. and 3:00 p.m., but she was advised by the medical personnel it was normal and nothing to worry about. Hospital records and progress notes from this time, some of which were sent to Dr. Chandra and Dr. Ravi for co-signature, indicate "no complaints" and "no bleeding." Contrary to Wyckoff Heights arguments, this creates a clear issue of fact as to the time Ms. Coronel's bleeding began and the hospital's adequacy in monitoring and evaluating her. Ms. Coronel also testified that she observed more bleeding when she used the bathroom at approximately 9:00 p.m., but Wyckoff Heights medical staff told her "[t]hat it was normal and that [she] was entering childbirth" and proceeded to administer Pitocin thereafter. These issues of fact and credibility must necessarily be resolved by a jury.
Plaintiffs' gynecological expert opines that it would be a deviation from the accepted standard of practice for the hospital staff to "fail to document the patient's complaints and report these complaints to the patient's attending physician." The expert further opines that vaginal bleeding is a symptom of potential placental abruption, and "if the patient's complaints of bleeding had been acted on earlier, the infant would have been delivered sooner" by c-section, and therefore the infant would have been in a less distressed condition than her eventual delivery at 1:22 a.m. The evidence that Ms. Coronel's alleged complaints of bleeding were never documented, and the inconsistencies in the record about which attending physician — if any — the residents and nurses were communicating with as her labor progressed and complaints of bleeding continued, create issues of fact as to independent negligence as to Wyckoff Heights that withstand summary judgment.
On the issue of the infant's care immediately following the c-section, Wyckoff Heights submits an expert affidavit from certified neonatologist Jonathan Davis, M.D. ("Dr. Davis"). Dr. Davis avers, with regard to all the treatment received by the infant after her delivery by emergency c-section, the Wyckoff Heights medical personnel took all appropriate steps to resuscitate the infant before and after she was transferred to NICU. The expert opines that there was nothing more that could have been done to save the infant's life, and no treatment rendered by the neonatologists deviated from acceptable standards or contributed to the infant's death.
Plaintiffs raise no opposition to this part of the motion, and they did not offer an expert opinion on the post-delivery care rendered to the infant. Therefore, any claims that the hospital was negligent in failing to properly intubate, ventilate, or resuscitate the infant, are dismissed.
The last allegation of malpractice with regard to Wyckoff Heights is the hospital's "failure to have Spanish interpreters available in a timely manner," as alleged in the bill of particulars. Of note, Plaintiffs do not assert a lack of informed consent for the c-section as an independent cause of action or theory of liability. Rather, Plaintiffs argue that the hospital's negligence in providing a Spanish interpreter led to a critical delay in communication and the physician's inability to perform the emergency c-section in a timely manner.
In support of the motion, Wyckoff Heights submits, inter alia, an affidavit from Dr. Swancoat and an affidavit from Wyckoff Heights's Chairman of Obstetrics and Gynecology, Ralph Ruggiero, M.D. ("Dr. Ruggiero"). Dr. Ruggiero avers that Wyckoff Heights engaged a service called LanguageLine to provide telephone interpreters for patients, and that if an interpreter is unavailable through LanguageLine, "there are Spanish speaking nurses and clerks throughout the hospital" (Dr. Ruggiero aff, ¶ 9). He further contends that it should have been the [*8]responsibility of the patient's private physician to obtain informed consent for a possible c-section before she was admitted to the hospital. Dr. Swancoat, whose deposition testimony is also in the record, avers that he assisted Dr. Mukherjee when he called for a c-section. When Dr. Swancoat called LanguageLine, the service "kept [him] on hold and was unable to provide an interpreter," and so they asked a hospital clerk named Michelle Arbolida "who had returned from her dinner break" to translate (Dr. Swancoat aff, ¶ 5).
In opposition, co-defendants Dr. Chandra, St. Nicholas Ob-Gyn, and Dr. Ravi submit another expert affirmation from Dr. Mucciolo, who noted that Dr. Chandra had obtained written consent for a potential c-section prior to Ms. Coronel's admission. Dr. Mucciolo opines that despite Dr. Chandra fulfilling this obligation, a physician faced with an unforeseen emergency during labor is "still obligated to explain the procedure and need for same to the patient before taking her to the operating room," and therefore "in the case of a non-English speaking patient, the translator must be readily available" (Dr. Mucciolo supplemental aff, ¶ 16-17).
In their own opposition, Plaintiffs submit an expert affirmation from a Chief Medical Officer for a health care network with experience in emergency medicine and health care management, (name of expert redacted). The Court was presented with the signed, unredacted affirmation for in camera inspection. Plaintiffs' expert notes that it is the statutory responsibility of a hospital, not a private attending physician, "to develop a language assistance program to ensure meaningful access to the hospital's services and reasonable accommodation for all patients who require language assistance" and to "ensure that non-English speakers receive the same quality and level of services equal to those provided to English speaking patients" (Plaintiff Expert B aff, ¶ 10; see also 10 NYCRR 405.7). "When a patient requests translation services, that request is treated as a request to the hospital" (Plaintiff Expert B aff, ¶ 12). The expert opines, based on the record and Dr. Swancoat's testimony, that the hospital deviated from the standard of care owed to their patients by relying only on the third-party vendor LanguageLine and not having an "adequate alternative plan" to obtain another translator if that vendor was unavailable or unreasonably delayed. He opines that contrary to Dr. Ruggiero's claim that there were Spanish speakers "throughout the hospital," the hospital did not have a clear procedure to "timely utilize" those individuals, and the hospital did not "familiarize all care providers" with such a procedure (id., ¶ 16).
The expert further opines that "on a labor and delivery unit, a hospital should be able to provide translation services within 10 minutes of a request by the patient," and the hospital's delay of approximately 30 minutes "resulted in a loss of critical time between decision and incision, during which the infant sustained hypoxia in utero" (id., ¶ 17). Plaintiffs' gynecological expert concurs that the standard "from decision to skin incision for a STAT cesarean section" is 30 minutes, but here the time that elapsed was 44- 52 minutes. Therefore, both experts opine that the hospital's inability to timely provide an interpreter resulted in a longer period of distress and deprivation from oxygen for the infant (Plaintiff Expert A aff, ¶ 44-46).
Plaintiffs have raised an issue of fact as to Wyckoff Heights's negligence in ensuring a Spanish interpreter was available. Plaintiffs' gynecological and health care management experts opine, based on the record and testimony, that the hospital's inability to timely provide an interpreter delayed Ms. Coronel's emergency c-section, and therefore caused a worse outcome for the infant's survival. The hospital provided no expert opinion on the adequacy or timeliness of their translation services. This question as to the appropriate standard of care is sufficient to preclude summary judgment on this issue as a matter of law.
For the reasons above, Wyckoff Heights's motion is granted only to the extent of dismissing claims of negligence in relation to infant's neonatal care, and the motion is otherwise denied.
Accordingly, it is hereby:
ORDERED that the branch of the motion (Seq. No. 7) seeking an Order, pursuant to CPLR 3212, awarding summary judgment to Defendants Prasanta Chandra, M.D., and St. Nicholas Ob Gyn Associates, P.C., is GRANTED TO THE EXTENT of dismissing any claims for lack of informed consent, and the motion is otherwise DENIED; and it is further
ORDERED that the branch of the motion (Seq. No. 7) seeking an Order, pursuant to CPLR 3212, awarding summary judgment to Defendant Bali K. Rava, M.D. is GRANTED TO THE EXTENT of dismissing any claims for lack of informed consent, and the motion is otherwise DENIED; and it is further
ORDERED that the motion (Seq. No. 8) seeking an Order, pursuant to CPLR 3212, awarding summary judgment to Defendant Shirley Webbe, D.O. is GRANTED without opposition, and all claims against said defendant are dismissed; and it is further
ORDERED that the motion (Seq. No. 9) seeking an Order, pursuant to CPLR 3212, awarding summary judgment to Defendant Wyckoff Heights Medical Center is GRANTED TO THE EXTENT of dismissing any claims of failure to properly intubate, ventilate, or resuscitate the infant, and the motion is otherwise DENIED.
The Clerk is directed to enter judgment in favor of SHIRLEY WEBBE, D.O.
This constitutes the decision and order of this Court.
ENTER.
Hon. Consuelo Mallafre Melendez
J.S.C.

Footnotes

Footnote 1:Dr. Webbe was the on-duty service attending doctor during the initial hours of Ms. Coronel's admission to Wyckoff Heights, prior to her transfer from triage to the labor and delivery floor.